Theodore J. Hartl (Wyoming Bar No. 7-5623)
hartlt@ballardspahr.com
Susan A. Smith (*pro hac vice* forthcoming)
smiths@ballardspahr.com
Benjamin N. Simler (*pro hac vice* forthcoming)
simlerb@ballardspahr.com
BALLARD SPAHR LLP
1800 Larimer Street Suite 1600
Denver, CO 80202
(303) 454-0528

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| HISMILE IP PTY LTD., HISMILE PTY LTD., and HISMILE, INC., | |
| Plaintiffs, | Civil Action No. 1:26-cv-221 |
| vs. | **JURY TRIAL DEMANDED** |
| WRITESY, LLC, MARBI LLC, MARBI LTD., GALACTIC BRANDS LTD., GALACT BRANDS LTD, GALACT LTD., MARINELA BEZER, and VLADIMIR GATCAN, | |
| Defendants. | |

## **COMPLAINT**

Plaintiffs Hismile IP Pty. Ltd., Hismile Pty. Ltd., and Hismile, Inc. (collectively, "Hismile") bring this action to stop the Defendants from selling unauthorized knock-off versions of Hismile's V34® Whitening Strips and related oral care products, including mouthwash.

Hismile sells its best-selling oral care products primarily online, but also in over 40,000 retail locations worldwide, including supermarkets, pharmacies, and beauty stores. Hismile has enjoyed huge success—selling hundreds of millions of dollars' worth of oral care products worldwide—and has built a large U.S.-based following. Unfortunately, Hismile's success has

1

gained the attention of copycats determined to free ride on Hismile's hard work. Among these are Defendants Writesy, LLC, Marbi LLC, Marbi Ltd., Galactic Brands Ltd.,  Galact Brands Ltd, Galact Ltd, Marinela Bezer, and Vladimir Gatcan (collectively, "Defendants" or "Dr Dent"), who, despite Hismile's demands that they stop, have continued in concert to infringe Hismile's distinctive trade dress, and trademarks, and engaged in false advertising, deceptive trade practices, and unfair competition. By way of this action, Hismile seeks redress, including injunctive relief and damages, a recall of all Infringing Products (as defined below) Defendants have sold and/or distributed, and an Order requiring the destruction of all Infringing Products, packaging, marketing material, and the equipment used to make them. In support of this Complaint, Hismile alleges, upon personal knowledge as to its own acts, and on information and belief and/or upon evidence as to the acts of others, as follows:

**PARTIES**

1.      Plaintiff Hismile IP Pty Ltd. is an Australian private limited company with its primary place of business in Queensland, Australia.

2.      Plaintiff Hismile Pty Ltd. is an Australian private limited company with its principal place of business in Queensland, Australia.

3.      Plaintiff Hismile, Inc. is a Delaware corporation with its principal place of business in Queensland, Australia.

4.      Defendant Writesy LLC is an inactive Wyoming limited liability company with a registered address of 1021 E Lincolnway, Suite #6431, Cheyenne, WY 82001. Defendant Writesy LLC was administratively dissolved on July 9, 2026. Writesy LLC is one of a number of related corporate vehicles used by the individual Defendants, identified below, to conduct the Dr Dent business and the infringing conduct described in this Complaint. Some of the trademark

2

registrations or applications for trademark registration used by the Dr Dent business, including those filed before the USPTO, were filed in the name of Writesy LLC, or were assigned by one of the other Defendants to Writesy LLC.

5.     Defendant Marbi LLC is a Wyoming limited liability company with a registered address of 1309 Coffeen Ave, Suite 1200, Sheridan, WY 82801. Marbi LLC is one of a number of related corporate vehicles used by the individual Defendants, identified below, to conduct the Dr Dent business and the infringing conduct described in this Complaint. Some of the trademark registrations or applications for trademark registration used by the Dr Dent business, including those filed before the USPTO, were filed in the name of Marbi LLC, or were assigned by one of the other Defendants to Marbi LLC.

6.     One or more of the foregoing Defendants owns and/or operates the "Dr Dent" brand in and for the U.S., including the U.S. Dr Dent website and the marketing, importation, and sale of the Infringing Products described below to U.S. consumers.

7.     Defendant Marbi Ltd., a private company limited by shares, registered under the laws of England and Wales, maintains a registered address of 71-75 Shelton Street, London, United Kingdom, WC2H 9JQ. Marbi Ltd is one of a number of related corporate vehicles used by the individual Defendants, identified below, to conduct the Dr Dent business and the infringing conduct described in this Complaint.

8.     Defendant Galactic Brands Ltd. is a private company limited by shares, registered under the laws of England and Wales (company number 15716863), with a registered address of 71-75 Shelton Street, London, United Kingdom, WC2H 9JQ. Galactic Brands Ltd. owns and operates the "Dr Dent" brand outside the U.S. and does business as "Dr Dent." Galactic Brands Ltd. is one of a number of related corporate vehicles used by the individual Defendants,

3

identified below, to conduct the Dr Dent business and the infringing conduct described in this Complaint.

9.    Defendant Galact Brands Ltd is a private company limited by shares, registered under the laws of England and Wales, with a registered address of 71-75 Shelton Street, London, United Kingdom, WC2H 9JQ. Galact Brands Ltd is a further related corporate vehicle used by the individual Defendants, identified below, to conduct the Dr Dent business and the infringing conduct described in this Complaint, and its name closely mimics that of Defendant Galactic Brands Ltd.

10.    Defendant Galact Ltd is a private company limited by shares, registered under the laws of England and Wales, with a registered address of 71-75 Shelton Street, London, United Kingdom, WC2H 9JQ. Galact Ltd is a further related corporate vehicle used by the individual Defendants, identified below, to conduct the Dr Dent business and the infringing conduct described in this Complaint, and its name closely mimics that of Defendant Galactic Brands Ltd.

11.    Defendants Marinela Bezer and Vladimir Gatcan are wife and husband who are Romanian nationals residing in London, United Kingdom. Ms. Bezer and Mr. Gatcan conspired with each other and with the foregoing Defendant entities, each of which they jointly own, operate, and control, and the Defendants collectively, cooperatively, and maliciously direct the design, manufacture, marketing, and sale of the Infringing Products as described below.

12.    The registered US addresses of both defendant Wyoming LLC entities are drop boxes or otherwise are not used by any of the Defendants other than for purposes of registration.

13.    Each of the English corporate Defendants shares a single registered office address with each other, namely a coworking space at 71-75 Shelton Street, London, Greater London, United Kingdom, WC2H 9JQ.

4

14.     Defendants Bezer and Gatcan work out of the foregoing office space.

15.     Defendants can be (and have been) reached by email at support@drdent.co, support@doctordent.co.uk, and dan.ceban@drdent.co. Defendants, through counsel, have acknowledged receiving and have responded to Hismile's cease-and-desist correspondence, including but not limited to those sent by or on behalf of Hismile on October 21, 2025, March 20, 2026, May 7, 2026 and June 5, 2026. Despite multiple notices, Defendants have refused to stop their infringing activities and, instead, have expanded upon them.

### JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under at least 28 U.S.C. §§ 1331, 1367(a), and 1338(a)-(b).

17.     The Court has personal jurisdiction over all Defendants, including under this State's long-arm statute and/or under Federal Rule of Civil Procedure 4(k) and the U.S. Constitution.

18.     For example, each of the Defendants has directed its activities into the U.S., including by forming and operating Defendant Writesy LLC and Marbi LLC in this State, and by conducting substantial business in the U.S., including this State, conspiring with the other Defendants to place the Infringing Products (defined below) into the stream of commerce themselves or through Writesy LLC and Marbi LLC, with full awareness that substantial quantities of the Infringing Products would be and have been shipped into the U.S., including this State, and each Defendant otherwise has directed its activities into the U.S. and this State by agreeing with the other Defendants to, or by causing, conspiring to, or assisting in the design and importation of the Infringing Products into, and the marketing, sale, or transportation of the Infringing Products in the U.S. and this State.

5

19.     Each of the Defendants has purposefully directed their activities at this State or have aggregate contacts with the U.S. as a whole, such that the exercise of jurisdiction over them comports with the Due Process Clause of the U.S. Constitution.

20.     Venue is appropriate in this District under 28 U.S.C. § 1391(b)-(c) and 28 U.S.C. § 1400(a) because Defendant Writesy LLC and Marbi LLC reside in, and maintains registered addresses in, this District; all Defendants are subject to personal jurisdiction in this State; and infringement has occurred in this District.

## FACTS

**Hismile's History and Success Story**

21.     Hismile was founded in Australia in 2014 by Nik Mirkovic and Alex Tomic.

22.     Since its humble beginnings, when Hismile only sold a teeth-whitening kit online, Hismile has grown into a globally-recognized oral care brand. Hismile's products are sold today not just online, but in over 40,000 retail locations, including supermarkets, pharmacies, and beauty stores worldwide.

23.     Hismile's products have been endorsed by celebrities such as Kylie Jenner, Kim Kardashian, and Conor McGregor, as in the following image from an April 2023 Sephora TikTok ad, in which Kim Kardashian says: "Okay, you guys know that I love Hismile, I use their

toothbrushes, their toothpaste, all of their whitening products, and their new V34 Colour

Corrector . . . .”



24.     By 2018, thanks to Hismile's viral success, the brand's founders were recognized

by Forbes' 30 Under 30 Asia list.

25.     In 2024 alone, Hismile sold over AUS$325 million worth of its oral care products

worldwide.

26.     Hismile's rapid success and growth was attributable, in part, to its well-executed

social media marketing campaigns, which built brand recognition and sales through a

combination of celebrity endorsements and social media influencers and affiliate marketers.

Hismile's years of hard work resulted in it now being considered "an internet sensation."

27.     Though its roots are in Australia, Hismile has built a substantial U.S. consumer

base, with products sold throughout the U.S. both online, such as via us.HISMILEteeth.com,

TikTok Shop, and Amazon, and through traditional retail partners such as Walmart, CVS, and

Target.

28.     Hismile has also invested substantial resources in developing distinctive product

trade dress, original creative content, and a highly recognizable brand identity. To that end

Hismile employs an in-house creative team that produces original video content, hook

voiceovers, scripts, and marketing copy for TikTok and other platforms, with an eye toward unique and recognizable branding.

29.    Among Hismile's distinctive and widely-recognized products are its V34® Whitening Strips, which Hismile has marketed, advertised, and sold through a variety of channels, including Facebook, Instagram, and TikTok, its e-commerce website, and traditional retail partners.

**Hismile's V34® Whitening Strips and Distinctive V34® Trade Dress**

30.    Since its debut in the market in June 2025, Hismile has marketed and sold its HISMILE® V34® Whitening Strips in distinctive purple packaging, using the same "hero" packaging color that it had previously used for several years across its entire V34® lineup of oral care products since 2021.

31.    For example, the HISMILE® V34® product line includes the following exemplary products, each released by the dates indicated in the below chart and bearing the distinctive V34® and HISMILE® marks and V34® Trade Dress:



| V34® Colour Corrector Serum, September 2021 | V34® Colour Corrector Foam, August 2022 | V34® Colour Corrector Powder, August 2022 |
| --- | --- | --- |



| V34® Whitening Toothpaste, September 2024 | V34® Whitening Strips (with silver sachet) June 2025 |
| --- | --- |

32. The HISMILE® V34® Whitening Strips box looks like this:



33. Hismile's HISMILE® v34® Whitening Strips box (packaging) has a distinctive color scheme, shape/orientation, and other visual elements that represent deliberate marketing and branding design choices and do not present any functional, utilitarian, or cost-savings benefits. This packaging includes the following distinctive, non-functional design elements (the "V34® Trade Dress"):

a. <u>Color</u>: the box features a dominant purple color with primarily white typography (features carried across the HISMILE® V34® product range).

b. <u>Shape</u>: the box is tall, narrow, and portrait-oriented (also used for other products in the HISMILE® V34® line).

9

    c.  <u>Additional elements:</u>

      i.  Near the upper right corner, a circular "badge" and the phrase "Experts in Whitening" written in a circular format.

      ii.  A white circular "badge" surrounding the number "30" and the text "MINS", the circle shape comprised partially of a curved arrow in the top left quadrant, with the remaining quadrants drawn as dashed lines (or letters ("APPLICATION") that appear similar to dashed lines).

      iii.  Brand name ("HISMILE") oriented vertically in large white text along the side face of the box.

      iv.  "Technology" "badges" for "V34" and "COLOUR CORRECTION TECHNOLOGY" as secondary identifiers above the product name.

      v.  Imagery, including a purple-colored whitening strip, slightly lifting from its backing card, with a white glow in the lifted edge.

34.    Hismile's V34® product line has long used silver-colored sachets as an additional distinctive, non-functional packaging feature that, in combination with its purple boxes, also comprises its V34® Trade Dress.

35.    In addition to registrations outside the U.S., also is the owner of common law and federally registered rights in the mark v34® for oral care and related products, including U.S. Trademark Reg. No. 7,239,793.

36.    Hismile also is the owner of common law and federally registered rights in the mark HISMILE® for oral care and related products, including U.S. Trademark Reg. Nos. 7,045,538, 7,045,539, and 8,319,868.

37.    Collectively, Hismile's common law and registered trade dress rights are referred to herein as Hismile's "Marks."

38.    In addition to extant registrations outside the U.S., Hismile has applied to register certain aspects of the distinctive V34® Whitening Strip packaging trade dress at the U.S. Patent and Trademark Office, with priority to its Australian registration of the same in International Class 3, which covers oral care products, specifically for: teeth whitening strips; teeth whitening preparations; and non-medicated oral care preparations (U.S. Trademark App. Ser. No. 79438718). Hismile anticipates that a federal trade dress registration will be issued on this application in due course, since its application was approved for publication by the USPTO. The V34® Trade Dress to-be-registered V34® is pictured below (with exclusive rights in "whitening strips" disclaimed):



39.    Hismile's V34® Trade Dress is ornamental, not functional, and its elements are distinctive from those used by legitimate market competitors. These ornamental features are not functional at least because, e.g., (1) competitors use other designs, including designs created prior to and after Hismile's V34® Trade Dress, (2) the Hismile V34® Trade Dress design does not provide any cost or quality advantage in the market for whitening strips, and (3) no competitors' ability to compete is significantly undermined by protecting Hismile's ornamental

design because other designs exist and are and have been used in the industry, including by

Defendants and others, e.g., as shown in the examples below:



40.    Hismile's V34® Trade Dress is fanciful and arbitrary with respect to teeth

whitening strips and mouthwash products, and thus is inherently distinctive.

41.    Additionally, for the reasons described in more detail below, Hismile's V34®

Trade Dress has also acquired substantial secondary meaning in the marketplace because it is and

had become associated with and indicative of the origin and quality of Hismile's products before

Defendants commenced their infringements.

**Hismile's Marketing and Sales Demonstrate Secondary Meaning in its Distinctive V34® Trade Dress**

42.    The unique look of Hismile's V34® Trade Dress including both the packaging

and advertising material that features that trade dress, coupled with Hismile's substantial

investment in developing its distinctive brands through marketing, and the resulting significant

sales, together have resulted in widespread consumer association between Hismile and its

distinctive V34® Trade Dress.

43.    Since releasing its V34® Whitening Strip products in 2025, Hismile has sold

significant quantities of V34® Whitening Strip packages with the V34® Trade Dress in the U.S.

12

44.    Since the launch of those products, Hismile has also made large investments to market its V34® Whitening Strips in the U.S. Nearly all Hismile's advertising of its V34® Whitening Strips prominently features the V34® Trade Dress.

45.    Previously and concurrently, Hismile had and has marketed and sold large quantities of its other V34® line of products incorporating the V34® Trade Dress in the U.S.

46.    Hismile's direct advertisements and its network of influencers together have reached hundreds of millions of consumers, including U.S. consumers, through online impressions.

47.    Not including its other global accounts or the accounts of social media influencers who have promoted Hismile's products, Hismile's global TikTok account, has more than 5 million followers of which approximately 43.3% are U.S. based, and its posts have received 107.5 million "likes." Hismile's U.S. TikTok account has more than 152 thousand followers, and its posts have received 3.8 million "likes." Many of those posts feature depictions of the trade dress for its V34® Whitening Strips packaging, receiving thousands of likes each.

48.    Hismile's Instagram account has 1.7 million followers, of which approximately 29.8% are U.S. followers. Its Instagram posts have featured depictions of the trade dress for Hismile's V34® Whitening Strips packaging, and those posts have received thousands of "likes."

49.    Hismile's Facebook account has 1.8 million followers, of which approximately 29.8% are U.S. followers. Its Instagram posts have featured depictions of the trade dress for Hismile's V34® Whitening Strips packaging, and those posts have received thousands of "likes."

50.     Hismile's U.S. website receives over approximately 10 thousand unique daily visitors, and the product pages for its V34® Whitening Strips alone (not including other marketing materials) have received thousands of visits per day.

51.     Hismile also markets and sells its products in combinations, such that its marketing or sale of one of its products frequently leads to additional or substituted sales of other products (including such other oral care items such as lip balms, toothpaste serum, and its V34® tooth whitening serum). Thus, the above-referenced sales and marketing data do not even account for the full reach of Hismile's marketing.

52.     Hismile's use of its V34® Trade Dress has been substantially exclusive and continuous in the U.S. since the time of their respective launches. The only other known users of similar trade dress are other recent market entrants who, like Defendants, have copied and infringed Hismile's distinctive packaging and advertising, and against whom Hismile also is directing and has directed enforcement efforts.

**Defendants' Infringement and Unfair Competition**

53.     Beginning no later than 2019 and continuing to the present, Defendants have engaged in a longstanding and repeated pattern of purchasing Hismile's oral care products, closely replicating them, and launching confusingly similar competing products under the "Dr Dent" brand shortly thereafter.

54.     Most recently, following the June 2025 global launch of Hismile's V34® Whitening Strips, Defendants purchased Hismile's V34® Whitening Strips on or about June 16, 2025, and only months later, in or about September and October 2025, launched their own knock-off product (outside the US), which they marketed as "Dr Dent Purple Whitening Strips" (the "Infringing Whitening Strips"). Defendants began marketing, selling, and shipping the

14

Infringing Whitening Strips into the United States, and all states, via their website at

shop.drdent.co, their TikTok Shop US and Amazon US, launched purple strips in the US on or

around November 15, 2025—after receiving Hismile's initial October 21, 2025 cease & desist

notice for the same products in the UK/Europe.

55.     As shown in the depictions below, Defendants previously had marketed whitening

strip products with packaging that had an entirely different visual design (the "Former Whitening

Strips"). But, when introducing their Infringing Whitening Strips, they copied not just the type of

product and marketing tactics from Hismile (as they had in the past), they also copied Hismile's

distinctive trade dress in order to capitalize upon the substantial goodwill and reputation

associated with Hismile, Hismile's V34® product line, and, in particular, Hismile's V34®

Whitening Strips.:

| Defendants' Former Whitening Strips | Defendants' Infringing Whitening Strips |
| --- | --- |



56.     The Former Whitening Strips had its own design elements (blue geometric design,

different typography, different layout). The Infringing Whitening Strips do not merely share a

purple color with Hismile—they abandon virtually every aspect of Defendants' former

presentation in favor of a design that mirrors Hismile's V34® Whitening Strips and V34® Trade Dress generally.

57.    In addition, the Infringing Whitening Strips prominently display the representation "IMPROVED FORMULA" on the front bottom right-hand corner of the packaging.

58.    In this context of Defendants' packaging that closely resembles Hismile's V34® Whitening Strips, consumers are likely to misunderstand the representation of an "Improved Formula" as a claim that the Defendants' product is improvement over, or is an improved version of or otherwise associated with, Hismile's V34® Whitening Strips.

59.    In addition, in circumstances where Defendants do not market any other whitening strip product apart from the Former Whitening Strips, the only logical explanation is that the Infringing Whitening Strips contain an "Improved Formula" compared to the Former Whitening Strips. Despite this, rather than simply introducing an improved formulation whilst maintaining their established product identity, Defendants simultaneously abandoned the packaging, branding and visual identity of their Former Whitening Strips and adopted packaging that closely resembles Hismile's distinctive trade dress. There is no apparent commercial necessity for a reformulation of a product to be accompanied by total abandonment of an established brand identity in favor of packaging closely resembling that of a competitor, unless the objective of the improved formula redesign was intended to appropriate and capitalize upon the substantial goodwill and reputation associated with Hismile and its V34® product line.

60.    Defendants have since also launched a related knock-off mouthwash product, marketed as Dr Dent's purple mouthwash, which they began marketing, selling, and shipping

into the U.S., and all states, in or around March 2026 (the "Infringing Mouthwash," and together with the Infringing Whitening Strips, the "Infringing Products").

61.    The following images depict examples of Defendants' Infringing Products:



62.    Hismile has not authorized, sponsored, manufactured, or approved any of Defendants' Infringing Products, the packaging or marketing for those products, or any of Defendants' activities.  Hismile is not in any way affiliated with Defendants, the Infringing Products, or the marketing or packaging of the Infringing Products.

63.    Defendants' Infringing Products are not identical to Hismile's V34® Whitening Strips, and the ingredients Defendants advertise for the Infringing Whitening Strips on their website and marketing materials differ materially from the ingredients printed on the Infringing

17

Whitening Strips' own packaging. For example, Defendants advertise that the product contains "Hydroxyapatite," which they claim "remineralizes and strengthens enamel while you whiten," yet that ingredient does not appear on the product's own packaging ingredient list, rendering the Infringing Products not only functionally inferior to Hismile's V34® Whitening Strips, but also the subject of false and misleading representations that present health and safety risks to consumers.

**Defendants' Willful Infringement and Copying of Hismile's V34® Trade Dress**

64.    To launch, market, and sell their Infringing Products, Defendants directly copied Hismile's distinctive V34® Trade Dress and marketing materials.

65.    Defendants' Infringing Products replicate nearly all aspects of the packaging of Hismile's V34® Whitening Strips packaging, including the protected V34® Trade Dress, as shown below:



18

66. As is facially obvious, Defendants copied at least the following V34® packaging elements for its Infringing Products in a clear and ongoing pattern of Defendants' imitating Hismile's product presentation:

| Element | Hismile | Dr Dent |
|---|---|---|
| Box color | All-over deep purple "hero" color | Deep purple background with a limited gradient emanating from the top right corner |
| Typography color | White on purple throughout | White or near-white on purple |
| Box shape / orientation | Tall, narrow portrait-oriented rectangular box | Tall, narrow portrait-oriented rectangular box |
| Time Badge | "30 MINS APPLICATION" Badge on front face with circle | "30 MINUTE APPLICATION" Badge on front face with circle |
| Product Image | Image of purple-colored whitening strip slightly lifting from its backing card, with a white glow in the lifted edge, appearing on left side of front face | Image of purple-colored whitening strip slightly lifting from its backing card, with a white glow in the lifted edge, appearing on left side of front face |
| Brand Name Depiction | Bold, white text sans serif typography arranged at a 90-degree angle, displayed vertically up the right side of the packaging | Bold, lighter color text sans serif typography arranged at a 90-degree angle, displayed vertically up the right side of the packaging |
| White tab across face of package | A white tab running across the top of front face with words across less than half the box face, left justified, in all capital letters | A white tab running halfway across the top of the packaging in which capitalized left-justified wording across less than half the box face is displayed, and a similar white tab across entire bottom face |
| Product sachet | Silver product sachets | Silver product sachets |

**Defendants' False and Deceptive Advertising, Labeling, and Marketing Tactics**

67. Beyond copying Hismile's distinctive packaging to trade on Hismile's hard-earned goodwill in its V34® Trade Dress, Defendants have employed numerous additional false

19

and deceptive marketing tactics to increase their profits while sowing consumer confusion about the source, safety, endorsement, and efficacy of their Infringing Products.

68.   Among other things, Defendants operate a structured affiliate and influencer marketing program for the Infringing Products, and Defendants' own influencer training materials explicitly train affiliates to model their content on Hismile's own social media marketing, including by showing affiliates Hismile's *own* influencer marketing videos as examples to replicate. Defendants also have no effective oversight process to prevent their affiliates from invoking Hismile's HISMILE mark in sponsored posts promoting the Infringing Products, despite Defendants' commercial relationship with, and ability to instruct, those affiliates.

69.   Defendants' training materials for social media influencers explicitly train affiliates to adopt Hismile's social media marketing approach. For example, in a training webinar directed at participants marketing the Infringing Mouthwash, Defendants showed participants videos of influencer marketing content relating to Hismile's own products as a model to be replicated, as shown in the below example:



| Dr Dent Affiliate Training Material |
| --- |

20

70.    Defendants' paid influencer marketers—who Defendants train to market Defendants' products on Defendants' behalf, and who are paid commissions for when Defendants make sales from their marketing—also have used the hashtag "#HISMILE" and tagged "@HiSmile" in sponsored social media posts promoting the Infringing Whitening Strips, including posts expressly marked "commission paid" and "Paid Partnership," demonstrating both actual confusion in the marketplace. For example:

71.    Additionally, Defendants' affiliate marketers, as directed or approved by Defendants and their agents, fail to disclose they are financially incentivized or compensated for their (faked) endorsements.

72.    Defendants' marketing for the Infringing Whitening Strips touts "5,642+ verified reviews," a "4.9 average rating," "97% would recommend," and "8+ average shades whiter," creating a false impression that these figures reflect genuine, independent consumer feedback

21

specific to the Infringing Whitening Strips, when in fact these figures are commercially curated, selectively presented, exaggerated, or outright false, and misleadingly suggest that all such reviews, ratings, and recommendations relate to the Infringing Whitening Strips when this is not the case.

73.     For example, on Amazon.com, Defendants manipulated their product listings by replacing prior, established whitening strips products with the purple strips product in the same listing, and by replacing prior mouthwash with the new mouthwash product in the same listing, in each case with the intended and accomplished effect of allowing the new, different product to falsely and deceptively appear as though it is the same product as to which the accumulated previous reviews and ratings were directed. This practice not only violates Amazon.com policies, but is deceptive, misleading, and false.

74.     Defendants have engaged in similar conduct in relation to the Infringing Mouthwash by creating a new Amazon and TikTok Shop listing for the same infringing product. The effect of this conduct is to dissociate the product from its original Amazon and TikTok listing, which had accumulated a poor star rating and numerous genuine negative consumer reviews, and instead present consumers with a new listing unburdened by that adverse review history, factors of which impact the overall health of the listing on the relevant platform. This has the effect of creating a more favorable product profile while preventing consumers from readily accessing or considering the negative reviews associated with the original listing.

75.     Defendants appear to have attempted to justify the creation of the new listing by introducing updated product packaging. However, the product itself is identical to the original product, with no changes to its formulation, intended use, or functionality beyond the external packaging. In those circumstances, the creation of a new listing is liable to convey to consumers

22

that they are purchasing a new or improved version of the product when, in reality, the underlying product is unchanged. By resetting the product listing in conjunction with a packaging refresh, Defendants are able to retain the commercial benefit of the original product while discarding the poor reputation it had acquired through genuine consumer feedback. Consumers viewing the new listing are deprived of information that would otherwise assist them in assessing the product, including the historical star rating and negative reviews accumulated on the original listing. The creation of a new listing therefore not only improves the apparent standing of the product within the Amazon and TikTok Shop marketplaces but is also liable to mislead consumers into believing they are considering a different or improved product, rather than the same product presented in updated packaging.



| Prior Amazon listing | Subsequent Amazon listing |
| Prior TikTok Shop listing (now combined with the Infringing Whitening Strips and is no longer available for separate purchase): | Subsequent TikTok Shop listing |

76.     Similarly, Defendants, directly and through their agents, artificially boost the popularity and the otherwise poor ratings for their Infringing products on various marketplaces by compensating or providing their "reviewers," who are in fact their own affiliate marketers, with payment and heavily discounted or free products without disclosing these facts to the public, and encouraged to make purchases from multiple accounts to allow multiple reviews and leave the false impression that the products are trending or popular, e.g., as in the following where "reviewer" affiliate marketers were asked to "bump" the "star rating" "back up" by leaving false reviews, and were paid "2x the amount you paid for the product directly to your bank account/paypal/revolut" to leave false verified "reviews" on A:



77.     Defendants' marketing for the Infringing Whitening Strips also displays "before and after" images that are derived from artificial intelligence or are otherwise digitally enhanced, and that are presented to consumers as authentic, unaltered depictions of real-world results, together with the accompanying representation that customers "achieve results of 8+ shades whiter." The following is an example:



78.     Indeed, Defendants (directly and through their agents) further advise their affiliates to exaggerate the purported benefits of its products by, for example, directing them to use different lighting for before/after conditions, to drink 3-4 cups of black coffee to stain their teeth for "before" shots.

79.     Consistent with the foregoing, Defendants' website advertises ingredients and associated claims for the Infringing Whitening Strips—including "Hydroxyapatite," "Potassium Citrate," and "Aloe Barbadensis Leaf Extract," each accompanied by specific therapeutic or cosmetic benefit claims, such as that they have remineralizing and anti-sensitivity benefits. Defendants' marketing for Infringing Whitening Strips falsely claims that the product "[p]rotects tooth structure while targeting stubborn stains with purple color-correction technology," therapeutic claims implying that the product protects, repairs, or improves tooth structure, without any registration, authorization, or scientific substantiation for such claims. Further, as printed on the Infringing Whitening Strips' packaging, these products do not contain the advertised ingredients, but instead contain the following listed ingredients: Glycerin, Propylene Glycol, Aqua, PAP, Cellulose Gum, Carbomer, PVP, Cocos Nucifera (Coconut) Oil, Sodium Hydroxide, Menthol, CI 17200, and CI 52090.

80.    Similarly, while Defendants' website homepage claims that its Infringing Products contain hydrogen peroxide, elsewhere on their website and in other marketing materials Defendants advertise (as a benefit) that the same products are "peroxide-free." These diametrically opposed statements cannot simultaneously be true.

81.    Defendants further label their Infringing Products and advertise them as being "Made in FDA-Registered Facilities" presented as a distinguishing benefit, including in a comparison chart vs "Typical Alternatives". This is deceptive and misleading, because FDA facility registration is a baseline statutory obligation and does not constitute FDA's approval or endorsement, and is not indicative of product quality. Defendants' presenting and marketing this requirement as a comparative differentiator conveys the false implication of superior FDA oversight or endorsement, when neither exists. Indeed, FDA and FTC both treat "FDA registered" as being misleading when framed as endorsement, as Defendants have.

82.    Defendants falsely represent that the Infringing Whitening Strips are "Dentist recommended" and were "[d]eveloped and tested by leading dental professionals for safe, reliable results" and "[d]esigned by top dental pros."

83.    Defendants' marketing materials and product packaging further make and have made literally false, deceptively misleading, and unsubstantiated efficacy claims regarding the Infringing Products, including: "up to 8X shades brighter," "8 shades in 30 minutes daily," "4x better whitening," "Removes 99% of your stains after just a week," "Results in 7 days," "8+ average shades white,." and provides "[l]ong term whitening – up to 7 shades whiter over time," None of these claims are supported by credible or verifiable clinical evidence. Subsequent to Hismile's cease-and-desist correspondence, Defendants backtracked from and removed several of these claims, implicitly admitting their falsity.

26

84.     Similarly, with respect to the Infringing Mouthwash, Defendants' advertising is further literally false and deceptively misleading because it is marketed as a whitening product (e.g., "Gentle Whitening," "Whitening you can trust," "Instant Whitening Effect"). Indeed, Defendants' affiliate marketers initially were instructed and trained to market the Infringing Mouthwash specifically as a whitening product. However, Defendants' creator brief now instructs that its product "does not chemically whiten teeth," that its effects are "very temporary," and that affiliates should no longer promote it as a whitening product. Nevertheless, the packaging continues to claim the opposite. Examples of training Defendants initially provided to its affiliate marketers are depicted below, together with Defendants' later admissions that the Infringing Mouthwash "is not a whitening product":





85.     Defendants' marketing materials and product packaging further make and have made literally false, deceptively misleading, and unsubstantiated establishment claims, including in sections describing the Infringing Products as "Clinically Proven" or "Clinically tested." No such product-specific clinical testing has ever been done.

86.     Defendants' marketing materials and product packaging further make and have made literally false, deceptively misleading, and unsubstantiated professional endorsement claims, such as that the Infringing Products are "Dentist recommended," "Developed and tested by leading dental professionals," "Designed by top dental pros," and "Formulated with practicing dentists." Even Defendants' brand, "Dr.Dent" is deceptive and misleading. Defendants and their products have never been associated with—let alone developed, tested, or recommended by— any dental professional.

28

87.    Defendants offer the Infringing Whitening Strips in two package sizes, marketed as containing "14 STRIPS" and "42 STRIPS." These representations appear prominently on the front of the product packaging and are repeated on Defendants' website and across various third-party e-commerce platforms. The product imagery commonly depicts the packaging alongside a single whitening strip sachet. In that context, a reasonable consumer would understand the representations of "14 STRIPS" and "42 STRIPS" to mean that the product contains 14 or 42 individual sachets (i.e., 14 or 42 applications). In fact, the products contain only 7 and 21 applications, respectively. Defendants' directions for use instruct consumers to apply one upper strip and one lower strip during each whitening treatment. Each treatment is supplied in a single sachet containing both the upper and lower strips affixed to a single plastic backing. Defendants nevertheless count the upper and lower strips separately, thereby representing that each application comprises two "strips." As a result, Defendants market products containing only 7 and 21 applications as containing "14 STRIPS" and "42 STRIPS," respectively. This method of presentation materially overstates the quantity of product supplied and conveys to consumers that they are receiving substantially more product, and correspondingly greater value, than is in fact the case. There is no apparent commercial purpose for presenting the quantity in this manner other than to inflate the perceived quantity and value of the product. Examples include:

29

 

Website product page:



TikTok shop listing:

**Product description**

Transform your smile with our revolutionary Purple Whitening Strips. Unlike traditional whiteners, our unique purple-tinted formula uses advanced color-correction technology to neutralize yellow stains while gently whitening teeth. Each treatment pack contains 14 or 42 enamel-safe strips designed to conform perfectly to your teeth, delivering professional-grade results in just 30 minutes per day. Our peroxide-free formula is ideal for sensitive teeth, eliminating deep stains from coffee, wine, and smoking without causing discomfort.

With no harsh chemicals or irritants, you can whiten your teeth with peace of mind, knowing that your oral health is prioritised. Embrace a brighter, more radiant smile with DR.Dent Purple Teeth Whitening Strips.

Amazon listing (with a "42 pack" badge):



**Top highlights**

| | |
|---|---|
| Brand | DrDent |
| Product Benefits | Brightening, Freshen Breath, Whitening |
| Active Ingredients | Glycerin |
| Item Form | Strip |
| Number of Items | 42 |

Amazon listing details:

**Item details**

| | |
|---|---|
| Brand Name | DrDent |
| Product Benefits | Brightening, Freshen Breath, Whitening |
| Item Form | Strip |
| Included Components | Instruction Manual |
| Age Range Description | Adult |
| Set Name | 42 Strips |
| Manufacturer | DrDent |
| Manufacturer Part Number | Professional Strips |
| Best Sellers Rank | #1,052 in Health & Household (See Top 100 in Health & Household) #2 in Teeth Whitening Strips |
| ASIN | B0GNND9PTV |
| Customer Reviews | 4.2 ★★★★☆ (4,865) 4.2 out of 5 stars |

**Measurements**

| | |
|---|---|
| Number of Items | 42 |
| Item Dimensions | 9.45 x 9.45 x 0.87 inches |
| Unit Count | 42 Count |

88.     Defendants' also falsely and deceptively market their products using fictitious strikethrough pricing, e.g., with every US product permanently showing a "Regular price" struck through with a 6–19% "Sale" discount (e.g., $29.98 → $24.99, "16% Off"). The "regular price," however has never been used, and is not and never has been an actual or bona fide prevailing price.

89.     Defendants also engage in bait-and-switch drip pricing schemes. For example, in violation of federal and state laws, Defendants' product collection page advertises a $24.99 price (struck from the false "regular" $29.98 price), but the product page defaults to a "Subscribe & Save" ordering options with a 2-pack monthly subscription pre-selected (mouthwash: $32.46, again struck from a false "regular" price of $59.96). A user clicking "One time purchase" still leaves the 2-pack pre-selected ($40.38), so a consumer must make two corrective clicks to buy the advertised $24.99 single pack.

90.     Through the foregoing conduct, Defendants misrepresent the nature, quality, composition, safety, efficacy, and origin of the Infringing Products and their association with Hismile.

91.     In short, Defendants have preyed on Hismile's reputation and goodwill— including through the misleading and unsubstantiated marketing claims described above—to market Defendants' knock-off goods in and to the U.S. (and elsewhere).

92.     These false or unsubstantiated claims, testimonials, and images are deceptive, misleading, and falsely pass off the Infringing Products as being equivalent or superior to, or otherwise associated with, Hismile's genuine products.

93.     Defendants' actions have been designed to cause, and have caused, actual confusion.

94.     Defendants claim to have sold over approximately 1,000,000 units of Infringing Products.

95.     Defendants' sales have been made on the basis of false and deceptive advertising, trademark and trade dress infringement, and false advertising.

**COUNT I**
**DIRECT AND SECONDARY**
**TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)**

96.     Hismile realleges the preceding allegations and incorporates them by reference herein.

97.     Defendants' advertisements, promotions, offers to sell, sales, importation, and/or distribution of the Infringing Products violate the Lanham Act, 15 U.S.C. § 1114, by infringing Hismile's registered trademarks.

98.     Defendant's use of Hismile's registered Marks and/or colorable imitations thereof, together with its related deceptive marketing practices, is likely to cause confusion, mistake, or deception as to the affiliation, connection, and/or association of Defendants with Hismile and as to the origin, sponsorship, and/or approval of the Infringing Products, at least by creating the false and misleading impression that Defendants or the Infringing Products are manufactured by, authorized by, or otherwise associated with Hismile.

99.     As a direct result of Defendants' infringements, Hismile has lost sales estimated at up to thousands of dollars for each day of the infringements.

100.    Defendants' use of Hismile's registered Marks and/or colorable imitations thereof in connection with their low-quality knock-offs that either do not function or function poorly, and have received substantial negative consumer feedback—including negative reviews posted on e-commerce portals and discussion boards, also has caused and, unless enjoined, will continue

to cause substantial and irreparable injury to Hismile for which there is no adequate remedy at law, including at least substantial and irreparable injury to the goodwill and reputation for quality associated with Hismile's registered marks, Hismile's products, and Hismile.

101.    Defendants' use of Hismile's registered Marks and/or colorable imitations thereof has been intentional, willful, and malicious. Defendants' bad faith is evidenced at least by the similarity of the trade dress and directly copied imagery and text in marketing materials, the pattern of purchasing and replicating Hismile's products, and continued disregard for Hismile's rights after Hismile asked Defendants multiple times, through multiple rounds of correspondence, to cease and desist from this activity.

102.    Defendants directly profit from, are aware of, and actively encourage and direct their affiliate marketers' and marketing agency's infringing acts, and have the practical ability to control but do not act to prevent such acts.

103.    Defendants' actions in their use, and inducement, contribution to, and aiding and abetting of others to use Hismile's registered Marks constitutes trademark counterfeiting.

104.    Hismile is entitled to injunctive relief, to recover at least Defendants' entire profits, Hismile's actual damages (including but not limited to lost profits and corrective advertising expenses), enhanced damages, costs, statutory damages, and reasonable attorney fees under at least 15 U.S.C. §§ 1114(a), 1116, and 1117.

105.    Defendants' acts are causing irreparable injury to Hismile and to its goodwill and reputation, for which Hismile has no adequate remedy at law, and will continue to both damage Hismile and deceive the public unless enjoined by this Court.

33

## COUNT II
### DIRECT AND SECONDARY FALSE DESIGNATION OF ORIGIN AND FALSE ADVERTISING (15 U.S.C. § 1125(A)-(B))

106.    Hismile realleges the preceding allegations and incorporates them by reference herein.

107.    Defendants' advertisements, promotions, offers to sell, sales, importation, and/or distribution of the Infringing Products violate § 43 of the Lanham Act, 15 U.S.C. § 1125(a)-(b) by infringing Hismile's V34® Trade Dress and Marks.

108.    Defendant's use of Hismile's V34® Trade Dress and Marks, and/or colorable imitations thereof is likely to cause confusion, mistake, or deception as to the affiliation, connection, and/or association of Defendants with Hismile and as to the origin, sponsorship, and/or approval of the Infringing Products, at least by creating the false and misleading impression that Defendants or the Infringing Products are manufactured by, authorized by, or otherwise associated with Hismile.

109.    Hismile's V34® Trade Dress and Marks are entitled to protection under the Lanham Act.

110.    Hismile's V34® Trade Dress includes unique, distinctive, and non-functional designs.

111.    Hismile has extensively and continuously promoted and used Hismile's V34® Trade Dress and Marks in the U.S. as a source indicator of its products.

112.    As a direct result of Defendants' infringements, Hismile has lost sales estimated at up to thousands of dollars for each day of the infringements.

113.    Defendants' use of Hismile's V34® Trade Dress and Marks and/or colorable imitations thereof in connection with their low-quality knock-offs that either do not function, or

34

function poorly, and that have received substantial negative consumer feedback—including negative reviews posted on e-commerce portals and discussion boards, also has caused and, unless enjoined, will continue to cause substantial and irreparable injury to Hismile for which there is no adequate remedy at law, including at least substantial and irreparable injury to the goodwill and reputation for quality associated with Hismile's V34® Trade Dress and Marks, Hismile's products, and Hismile.

114.    Defendants' use of Hismile's V34® Trade Dress and Marks and/or colorable imitations thereof has been intentional, willful, and malicious. Defendants' bad faith is evidenced at least by the similarity of the trade dress and text in marketing materials, the pattern of purchasing and replicating Hismile's products, and continued disregard for Hismile's rights after Hismile asked Defendants multiple times, through multiple rounds of correspondence, to cease and desist from this activity.

115.    Defendants' conduct alleged herein also constitutes recurring false advertising.

116.    Defendants' commercial advertising and promotion falsely or misleadingly describes or represents facts concerning the nature, characteristics, and qualities of their goods, services, or commercial activities.

117.    Defendants' labeling and marketing contain deceptive and materially misleading statements concerning the Infringing Products' active ingredients, as described herein Defendants misleadingly and deceptively misrepresent and cause their affiliate marketers to misleadingly and deceptively misrepresent the Infringing Product to consumers, including without limitation by misrepresenting those products' active ingredients.

118.    Defendants directly profit from, are aware of, and actively encourage and direct their affiliate marketers' and marketing agency's infringing acts and false and deceptive advertisements, and they have the practical ability to control but do not act to prevent such acts.

119.    Defendants engaged in the foregoing unlawful conduct willfully, wantonly, and with reckless disregard for the truth.

120.    Hismile is entitled to injunctive relief, to recover at least Defendants' entire profits, Hismile's actual damages (including but not limited to lost profits and corrective advertising expenses), enhanced damages, costs, and reasonable attorney fees under at least 15 U.S.C. §§ 1125(a), 1116, and 1117.

121.    Defendants' acts are causing irreparable injury to Hismile and to its goodwill and reputation, for which Hismile has no adequate remedy at law, and will continue to both damage Hismile and deceive the public unless enjoined by this Court.

### COUNT III
### COMMON LAW UNFAIR COMPETITION

122.    Hismile realleges the preceding allegations and incorporates them by reference herein.

123.    Defendants' unauthorized use of Hismile's V34® Trade Dress and marks, marketing materials, and/or colorable imitations thereof, constitutes a false designation of origin, passing off, trade dress infringement, and a false description or representation that the Infringing Products are authorized by Hismile, and is thereby likely to confuse consumers.

124.    Defendants purposefully created the Infringing Products to emulate Hismile's V34® Trade Dress and marks and/or confusingly similar variants thereof. Defendant misappropriated the labors and expenditures of Hismile in bad faith with full knowledge that

36

Hismile's V34® Trade Dress and marks are associated exclusively with Hismile and exclusively designate Hismile's products.

125.    Defendants directly profit from, are aware of, and actively encourage and direct their affiliate marketers' and marketing agency's infringing acts, and have the practical ability to control but do not act to prevent such acts.

126.    Defendants' acts of unfair competition were and are wanton, willful, and deliberate and are intended to reap the benefit of the goodwill and reputation associated with Hismile's V34® Trade Dress and marks.

127.    As a result of Defendants' unfair competition, Hismile has lost profits, suffered price erosion (because Defendants also have sold their knockoff Infringing Products at lower prices), incurred corrective advertising expenses, and has otherwise been damaged.

128.    The aforesaid conduct of Defendants is causing irreparable injury to Hismile and to its respective goodwill and reputation, for which Hismile has no adequate remedy at law, and will continue to both damage Hismile and deceive the public unless enjoined by this Court.

### COUNT IV
### WYOMING CONSUMER PROTECTION ACT: WYO. STAT. ANN. §§ 40-12-101 TO 40-12-114

129.    Hismile realleges the preceding allegations and incorporates them by reference herein.

130.    As described above, Defendants have knowingly, in the course of business, and in connection with consumer transactions, engaged in bait and switch and other deceptive advertising tactics and made misrepresentations of concerning the source, origin, standard, purpose, and quality of their merchandise, sponsorship or affiliations, and the fact of or reasons for price reductions.

37

131.    Hismile has provided Defendants with notice of their deceptive practices with one year of its discovery of said unlawful practices.

132.    As a result of Defendants' acts, Hismile has lost profits, suffered price erosion (because Defendants also have sold their knockoff Infringing Products at lower prices), incurred corrective advertising expenses, and has otherwise been damaged.

133.    Defendants' acts have been and are wanton, willful, and deliberate.

134.    The aforesaid conduct of Defendants is causing irreparable injury to Hismile and to its respective goodwill and reputation, for which Hismile has no adequate remedy at law, and will continue to both damage Hismile and deceive the public unless enjoined by this Court.

## JURY TRIAL DEMAND

Hismile requests a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

Hismile requests that this Court enter judgment in its favor and against Defendants, and grant Hismile the following relief:

1.    A judgment that Hismile's V34® Trade Dress and Marks are valid and protectible, and that Defendants have infringed the foregoing and committed unlawful counterfeiting in violation of §§ 1114 and 1125(a) of Title 15 of the United States Code and common law;

2.    A judgment that Defendants have engaged in false advertising, deceptive trade practices, and unfair competition under § 1125(a) of Title 15 of the United States Code, Wyo. Stat. Ann. §§ 40-12-101 to 40-12-114, and the common law;

3.    A preliminary and permanent injunction enjoining Defendants and their officers, agents, servants, employees, users, attorneys, and all those persons in active

38

concert or participation with any of them now or in the future from the acts described in this Complaint, including, without limitation, enjoining them from making, offering to sell, selling, marketing, advertising, importing into the U.S., or transporting in or through the U.S., or otherwise distributing any oral care products in boxes having a dominant purple color with primarily white typography that appear the same or substantially similar to Hismile's.

4.    An Order that any owners, operator, or facilitator of any retail, wholesale, marketplace, exchange, advertising platform, or other physical, virtual, or digital establishment or platform who receives actual notice of the Order be directed to destroy all Infringing Products in their inventory, possession, custody, or control, and related advertising, product listings, or the like for the Infringing Products.

5.    An Order directing Defendants to recall all Infringing Products sold and/or distributed and to provide a full refund for all recalled Infringing Products;

6.    An Order directing the destruction of: (i) all Infringing Products, including all recalled products, (ii) any other products that use a copy, reproduction, or colorable imitation of Hismile's trade dress in Defendants' possession or control, (iii) all molds, tooling, plates, CAD files, machines, plates, and digital files or other articles and any other means of making the Infringing Products or marketing material therefore in Defendants' possession, custody, or control, (iv) all computers, electronic devices, social media accounts, and websites Defendants have used to promote the Infringing Products; and (v) all advertising materials related to the Infringing Products in Defendants' possession, custody, or control,

39

including on the Internet, pursuant to at least 15 U.S.C. § 1118 and applicable state law;

7. To the extent compatible with the scope of the Order in the preceding paragraph, an Order directing Defendants to publish a public notice on all e-commerce, social media, and other marketing channels they have used that provides a proper attribution of Hismile's trade dress to Hismile, and to provide a copy of this notice to all customers, distributors, marketing affiliates, influences, and/or others whom Defendants employed, paid, solicited, or otherwise used to market or sell the Infringing Products, or that they sold or recalled Infringing Products to or from;

8. An Order requiring Defendants to pay Hismile its actual damages arising out of Defendants' acts of common law unfair competition, deceptive practices, false advertising, and trade dress infringement, including without limitation all lost profits, price erosion, and corrective marketing expenses;

9. An Order requiring Defendants to provide complete accountings for any and all monies, profits, gains and advantages derived by Defendants from the manufacture, import, export, advertising, marketing, promoting, distributing, displaying, offering for sale, sale and/or otherwise dealing in the Infringing Products;

10. An Order requiring Defendants to account for and pay over to Hismile the profits realized by Defendants (and treble those profits), pursuant to 15 U.S.C. § 1117(a) and (b), and applicable state law, arising out of Defendants' acts of willful trademark and trade dress infringement, and false advertising;

40

11.    An Order requiring Defendants to pay Hismile treble damages and/or statutory damages of $2,000,000 per registered mark per type of goods, pursuant to 15 U.S.C. § 1117(b)-(c);

12.    An Order awarding exemplary or punitive damages against Defendants and in favor of Hismile;

13.    An Order requiring Defendants to pay Hismile its reasonable attorneys' fees and costs;

14.    An Order requiring Defendants to pay Hismile pre-judgment and post-judgment interest to the full extent allowed under the law; and

15.    An award to Hismile of such further relief at law or in equity as the Court deems just and proper.

Dated: July 22, 2026

By:   */s/Theodore J. Hartl*

Theodore J. Hartl (Wyoming Bar No. 7-5623)
hartlt@ballardspahr.com
Susan A. Smith (*pro hac vice* forthcoming)
smiths@ballardspahr.com
Benjamin N. Simler (*pro hac vice* forthcoming)
simlerb@ballardspahr.com
BALLARD SPAHR LLP
1800 Larimer Street Suite 1600
Denver, CO 80202
(303) 454-0528

*Attorneys for Plaintiffs*

f